UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
at KNOXVILLE

ROBERT ROSADO                    )
                                 )
        *Plaintiff*,             )
                                 )
v.                               )        No. 3:08-cv-353
                                 )        *Jordan*
                                 )
CITY OF HARRIMAN, TENNESSEE,     )
et al.                           )
                                 )
        *Defendants*.            )


## MEMORANDUM


This is a civil rights action pursuant to 42 U.S.C. § 1983 filed by plaintiff Robert

Rosado ("plaintiff"); plaintiff is represented by counsel. The matter is before the court on

the motion for summary judgment filed by the City of Harriman, Tennessee, and Harriman

police officers Steve Alcorn[1] and Baron Tapp, and plaintiff's response thereto; and the motion

for summary judgment filed by Roane County, Tennessee, Roane County jail supervisor Ken

Mynatt, and jailer Alex French, and plaintiff's response thereto. For the following reasons,

the motion for summary judgment filed by the City of Harriman, Tennessee, and Harriman

police officers Steve Alcorn and Baron Tapp [Doc. 52] will be **GRANTED**; the motion for

summary judgment filed by Roane County, Tennessee, Roane County jail supervisor Ken

---

[1]Steve Alcorn died after this action was filed. On motion of plaintiff, Mr. Alcorn's surviving
wife and children were substituted for defendant Alcorn in this action.

Mynatt, and jailer Alex French [Doc. 55] will be **GRANTED**; and this action will be

**DISMISSED WITH PREJUDICE**.  All other pending motions will be **DENIED** as

**MOOT**.

I.      **STANDARD OF REVIEW**

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment

"should be rendered if the pleadings, the discovery and disclosure materials on file, and any

affidavits show that there is no genuine issue as to any material fact and that the movant is

entitled to judgment as a matter of law."[2] "In considering a motion for summary judgment,

the court must view the facts and all inferences to be drawn therefrom in the light most

favorable to the non-moving party." *60 Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435

(6th Cir. 1987).  *See also Kochins v. Linden-Alimak, Inc.*, 799 F.2d 1128, 1133 (6th Cir.

1986); *Securities and Exchange Commission v. Blavin*, 760 F.2d 706, 710 (6th Cir. 1985).

The burden is on the moving party to conclusively show that no genuine issue of material

fact exists.  *Smith v. Hudson*, 600 F.2d 60, 63 (6th Cir. 1979).

> Not every factual dispute between the parties will prevent summary judgment.
> The disputed facts must be material. They must be facts which, under the
> substantive law governing the issue, might affect the outcome of the suit. The
> dispute must also be genuine. The facts must be such that if they were proven
> at trial a reasonable jury could return a verdict for the non-moving party. The

---

[2]A revised version of Rule 56 took effect December 1, 2010.  The pending motion for
summary judgment was filed prior to that date and is governed by the version of Rule 56 in effect
at that time.  *See Wheeler v. Newell*, No. 09-4549, 2011 WL 204457 at *2 n.3 (6th Cir. Jan. 24,
2011) (unpublished decision).

disputed issue does not have to be resolved conclusively in favor of the non-moving party, but that party is required to present some significant probative evidence which makes it necessary to resolve the parties' differing versions of the dispute at trial.

*60 Ivy Street Corp. v. Alexander*, 822 F.2d at 1435-36 (citations omitted).

Once the moving party presents evidence sufficient to support a motion for summary judgment, the non-moving party is not entitled to a trial merely on the basis of allegations. The non-moving party must present some significant probative evidence to support its position. *White v. Turfway Park Racing Association, Inc.*, 909 F.2d 941, 943-44 (6th Cir. 1990); *Gregg v. Allen-Bradley Co.*, 801 F.2d 859, 861 (6th Cir. 1986). Mere allegations of a cause of action will no longer suffice to get a plaintiff's case to the jury. *Cloverdale Equipment Co. v. Simon Aerials, Inc.*, 869 F.2d 934, 937 (6th Cir. 1989).

Summary judgment should not be disfavored and may be an appropriate avenue for the "just, speedy and inexpensive determination" of an action. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986). The moving party is entitled to judgment as a matter of law "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id*. at 322.

## II.    **FACTUAL BACKGROUND**

Plaintiff is a resident of Roane County, Tennessee. He alleges that he was subjected to excessive force during his arrest in Harriman, Tennessee; that he was denied medical treatment for the injuries he incurred; and that he was then denied medical care during his

3

subsequent confinement in the Roane County Jail, in violation of his rights under the Fourth, Eighth, and Fourteenth Amendments  The defendants are City of Harriman, Tennessee; Harriman police officers Steve Alcorn ("Alcorn") and Baron Tapp ("Tapp"); Roane County, Tennessee; Roane County jail supervisor Ken Mynatt ("Mynatt"); and jailer Alex French ("French").  The individual defendants were sued in their individual and official capacity.

## A.  Plaintiff's Factual Allegations Against the City Defendants

The following facts are taken from plaintiff's amended complaint. [Doc. 2, Amended Complaint].  Late in the evening of September 4, 2007, or during the early morning hours of September 5, 2007, plaintiff argued with his girlfriend, Jeri King, at her house.  He then went to sleep in a bedroom of Ms. King's residence but was awakened by defendants Alcorn and Tapp.  Plaintiff told those officers that there was an outstanding arrest warrant for him.  Upon plaintiff's request, the officers permitted him to gather clothes, then handcuffed him in the back, placed him in the back seat of a cruiser, and shut the car door.

Soon thereafter, Alcorn opened the back door of the car and twice asked plaintiff to give him his girlfriend's cell phone battery.  Upon plaintiff's second denial that he had the cell phone battery, Alcorn yanked plaintiff, still in handcuffs, out of the back seat, and slammed him onto the police car.  Plaintiff twisted around to ask Alcorn what he was doing and Alcorn, still holding on to plaintiff, slammed him to the ground, landed on top of him, and sprayed him with mace.  Plaintiff's shoulder struck the pavement and was seriously injured. Plaintiff was searched, but the battery was not found, and he was charged with resisting arrest, although the charge was later dismissed.

4

As a result of Alcorn's conduct, plaintiff sustained scrapes on his legs and a severe shoulder injury, evidenced by a large and visible bump on his shoulder. Although plaintiff complained that his shoulder was hurt and asked to be taken to the hospital, Alcorn and Tapp, adhering to what plaintiff believes to be the City's pattern or practice of transporting injured detainees to the Roane County jail rather than to the hospital, took him to the jail instead.

## B. Plaintiff's Factual Allegations Against County Defendants

When he arrived at the Roane County jail, plaintiff told a jailer that his shoulder was hurt. The jailer looked at plaintiff's shoulder and commented that he was tired of the Harriman Police beating up people and then dumping them at the jail for the jail to deal with. Rather than seek the medical care plaintiff had requested, the jailer manipulated plaintiff's shoulder, attempting to pop the shoulder back in place. This procedure, to which plaintiff did not consent, was painful, but the jailer ignored plaintiff's request for him to stop and continued pushing and pulling on plaintiff's arm. Afterwards, plaintiff was escorted to a cell.

The next day, two X-Rays were taken of his shoulder, but, according to the nurse who received the radiology report, the results showed no fracture or dislocation in the shoulder. For the remainder of his stay in the jail and despite numerous grievances requesting treatment (presumably for his shoulder injury), plaintiff was given no further medical treatment, other than Tylenol, even though the defendants were aware that his shoulder, in fact, was seriously injured. Indeed, when he reported his need for medical attention for his injury to a state inspector who was passing through the jail, defendant Mynatt responded, in her presence,

that he would do something about it. Mynatt later admitted to plaintiff that he could see that his shoulder was messed up.

In addition to the shoulder problem, plaintiff also contracted a staph (staphylococcus) infection in the scraped areas on his legs because the defendants did not take appropriate measures to control an outbreak of staph among the jail population. Likewise, because the defendants did not take appropriate measures to treat plaintiff's infection, he developed large painful sores on his legs, which eventually evolved into scars.

On September 24, 2007, plaintiff left the jail and went to the Methodist Medical Center Emergency Room, where he was diagnosed as having an AC Separation in his shoulder. He was prescribed pain medication, an anti-inflammatory, and an arm compression sling to wear to keep his clavicle in the correct position to promote proper healing. Plaintiff was advised to follow up with Dr. McKay, a bone specialist, who, coincidentally, was also plaintiff's primary care physician. Seven days later, on October 1, 2007, plaintiff was again arrested and taken to the Roane County jail.

Plaintiff told the defendants about his arm sling and his prescribed medications, but they refused to permit him to take those medications or even to restart the Tylenol he had been given before. Also, unbeknownst to plaintiff, the arm sling was delivered to the jail, but was not given to him. Instead, the defendants placed the sling in his personal property to give to him upon his release. Plaintiff made numerous requests that the defendants obtain the arm sling but they told him, untruthfully, that no one had brought that item to the jail.

6

Plaintiff also filed numerous grievances requesting medical care, but none was given and, at some point, he was transferred without his arm sling to the Loudon County Jail.

### C. City Defendants' Version of the Facts

The City defendants' version of the facts is taken from their motion for summary judgment and supporting documentation, including excerpts from the depositions of plaintiff, Alcorn, and Tapp. [Doc. 52, Motion for Summary Judgment, Attachments 1-19]. The City defendants' narration of the circumstances surrounding the incident includes events which preceded the officers' appearance in plaintiff's bedroom, which he has not supplied, and fill in the gaps of plaintiff's accounting. According to these defendants, on the evening in question, plaintiff argued with his girlfriend and one of her daughters. He left the King home, went to a friend's house, got drunk, and then returned to his girlfriend's house. Once there, another argument erupted between plaintiff and Ms. King's daughters, primarily concerning their use of plaintiff's cellular telephone. When plaintiff's limited capacity to tolerate the daughters was spent, he took refuge from the brouhaha by going into the bedroom to watch a film.

Shortly thereafter, Alcorn, Tapp, and another officer, were dispatched to the King home in response to a 911 call from one of Ms. King's daughters. The officers - all arriving separately at the residence - entered the King home, found plaintiff lying in the bedroom, and told him he needed to accompany them because an arrest warrant was pending against him. Plaintiff, who admittedly was drunk, was handcuffed with hands in the front. As the officers escorted him out of the bedroom, he plucked a cell phone from a bedside table, and obtained

permission from Tapp to use it.  As he was being taken to the squad car, Ms. King and her daughters stood on the porch, yelling to the officers that he had a cell phone with him. (Unobserved, plaintiff had thrown the phone into the yard while being escorted to the squad car.)  Plaintiff was placed in the back seat of the cruiser but, through the back window, resumed the cell-phone dispute with Ms. King.  The officers urged Ms. King to go back into the house, but she remained on the porch and continued to argue with plaintiff, insisting that the cell phone was hers and that she wanted it back before he left.

To diffuse the situation, Tapp asked plaintiff to give him the phone, but he responded that he did not have the phone.  The question was posed again and Plaintiff was given "five seconds" to hand over the item.  When plaintiff gave the same response, Tapp[3] (using plaintiff's deposition description of the incident) "jerked [him] out of the car, slammed [him] up against the back of the car," with his chest and face making contact with the vehicle, and patted him down.  [Doc. 52, Attachment 7, Excerpt from Deposition of Robert Rosado, pp. 27-28[4]].  Tapp stated that he became fearful of plaintiff because the arrestee was very angry and cursing.  Plaintiff, whose chest was still on the car, turned as far as his eyes would let

_____

[3]Plaintiff alleged in the complaint that Alcorn jerked him from the vehicle, but testified in his deposition that he could not recall the identity of the officer who pulled him from the cruiser. [Doc. 52, Attachment 7, Excerpt from Deposition of Robert Rosado, p. 27].  Tapp acknowledged, however, in his deposition that he was the one who removed plaintiff from the back seat of the vehicle.  [*Id*., Attachment 8, Excerpt from Deposition of Baron Tapp, p. 7].

[4]With respect to deposition excerpts, the court will refer to the ecf page number of the document that is in the footer of each page and not the page number in the deposition itself.

him and asked the officer, "what the hell he was doing?", and the next thing [he knew, he] was on the ground maced." [*Id*. at 28-30].

According to the defendants, Alcorn, who had been standing to the plaintiff's right, grabbed his arm and stepped in front of him. The defendants maintain that Alcorn unhinged one of plaintiff's handcuffs, preparing to switch the handcuffs from the front to the back and that, at this point, only one handcuff remained attached to plaintiff's arm. Plaintiff turned, twisted around, and Alcorn's leg became entwined with plaintiff's legs, causing both of them to fall to the ground. Alcorn rotated his body to land on top of plaintiff, as officers are trained to do so as to retain control and prevent a suspect from gaining an advantage over an officer.[5]

Defendants claim that a brief scuffle ensued between the two, as Alcorn attempted to fasten the loose handcuff. Alcorn was struck in the eye with the loose handcuff and quickly gave plaintiff a half burst of pepper spray. Plaintiff stated that he was blacking in and out after he hit the ground. Plaintiff offered his hand, the handcuff was attached, and, after catching his breath, was helped up and placed back in the cruiser by Alcorn. Plaintiff did not request medical care or to be taken to the hospital and, a short time latter, a county deputy sheriff arrived and transported him to the jail.

---

[5]Phil Keith, former Chief of Police for the City of Knoxville, Tennessee, testified by affidavit that proper police procedure requires an officer to fall on top of a suspect if the two are falling simultaneously. [Doc. 52, Attachment 1, Affidavit of Phil Keith, p. 2].

## D. County Defendants' Version of the Facts

The County defendants' version of the facts is taken from their motion for summary judgment and supporting documentation, including excerpts from the depositions of plaintiff and Mynatt. [Doc. 55, Motion for Summary Judgment, Attachments 1-22]. According to the County defendants, plaintiff was incarcerated in the Roane County jail on September 5, 2007; released on September 24, 2007; re-incarcerated on October 1, 2007; and transferred to another facility on December 6, 2007, to serve a six-months sentence.

During the booking process, plaintiff stated that he had a serious medical condition. That same day, plaintiff spoke with Mynatt about his shoulder, completed a medical request form indicating that he thought that his collar bone might be broken, and was taken to see the jail nurse for an examination and a referral for an X-ray. According to the nurse's notations on the medical request form, plaintiff had a right shoulder injury; was to be treated with medication; have a mobile x-ray taken the same day; and, following the x-ray, have an appointment made for him with an orthopedic doctor. Plaintiff was also instructed, when he thereafter spoke with another nurse about his injury, to continue taking the prescribed medication.

On September 20, 2007, plaintiff filled out a medical request form complaining about two sores on his leg, which he described as "red and oozing pus and blood." Again, a notation on the medical request form indicates that he was seen by a member of the medical staff and given medication to treat his condition.

Plaintiff was released from the jail on September 24, 2007, but was arrested six days later and returned to the jail. Plaintiff stated on the inmate booking questionnaire on that date that he had no serious medical condition requiring attention while he was there, but that same date, he also submitted a medical request form, in which he indicated that he had seen a doctor, that he was to see a "bone specialist on Wednesday," and, somewhat inconsistently with his previous statement, that he needed to have someone contact the hospital E.R. to find out when he was supposed to see the bone specialist.

On October 3, 2007, plaintiff filed another medical request form, complaining that someone was supposed to check with the hospital about his seeing a bone specialist, presumably implying that this task had not been performed, and also indicating that he was supposed to wear a sling for six to eight weeks, and that his sling could be brought to the jail. The jail nurse noted on the form that she would check with the E.R. about the appointment and also with the security officer as to whether slings were allowed in the jail.

On October 25, 2007, plaintiff submitted a grievance, pointing out that he had injured his shoulder two months previously, that he had been waiting for one month to see the bone specialist whom he was supposed to see, that nothing yet had been done, and also requesting that his medical records be obtained from the E.R. and that he be taken to the doctor as he was supposed to have been. French, in response to the grievance, indicated that he would check with the nurse to see whether those arrangements had been made. The next day, the nurse replied that no appointment had been made for plaintiff, that his x-ray was normal, that she would send for his medical records from the E.R., that his condition was not

life-threatening, and that he could see a specialist of his choice upon his release from custody. On December 6, 2007, plaintiff was transferred to another correctional facility.

## III.    INITIAL CONSIDERATION – ADMISSIBILITY OF DOCUMENTS

The court must decide two initial issues: (1) whether documents have been authenticated and may be considered in ruling on the summary judgment motions and (2) whether plaintiff's declaration likewise may be considered.

### A.  The Authentication Question

Plaintiff charges that many of the exhibits (mostly jail documents) attached to the County defendants' motion have not been properly authenticated and would not be admissible at trial. Plaintiff is correct that documents submitted in support of a summary judgment motion must qualify for admission at a trial. Fed. R. Civ. P. 56(c), (e). According to Federal Rule of Evidence 901, "[a]uthentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims."

As a remedial measure and while contesting plaintiff's challenges to the documents, the County defendants have supplied the affidavit of former Jail Administrator and defendant Ken Mynatt, in which he avers that he has personal knowledge of many of those documents and that they are true and accurate representations of what they are claimed to be. [Doc. 70, Attachment 1, Affidavit of Ken Mynatt]. His affidavit suffices to authenticate those

12

documents. The other challenged documents were used by plaintiff, are duplicative of other admissible documents, or are self-authenticating.

### B. The Declaration

The next dispute to be resolved concerns plaintiff's declaration, offered after the motions for summary judgment were filed and now challenged by the City defendants on the basis that it cannot be used to raise issues which controvert his deposition testimony. *See O'Brien v. Ed Donnelly Enterprises, Inc.*, 575 F.3d 567, 588 (6th Cir. 2009) ("'a party cannot create a genuine issue of material fact by filing an affidavit, after a motion for summary judgment has been made, that essentially contradicts [her] earlier deposition testimony'") (quoting *Penny v. United Parcel Service*, 128 F.3d 408, 415 (6th Cir. 1997)).  However, if the prior deposition is internally inconsistent, so that an affidavit does not directly contravene the deposition testimony, a court must consider it, unless it attempts to create a sham fact issue. *Aerel, S.R.L. v. PCC Airfoils, L.L.C.*, 448 F.3d 899, 908 (6th Cir. 2006).  A sham fact issue is determined by examining factors such as "whether the affiant was cross-examined during his earlier testimony, whether the affiant had pertinent evidence at the time of his earlier testimony or whether the affidavit was based on newly discovered evidence and whether the earlier testimony reflects confusion [that] the affidavit attempts to explain." *Id.* at 909 (quoting *Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th Cir. 1986)).  These rules are designed to show the significance of winnowing "legitimate efforts to supplement the summary judgment record from attempts to create a sham issue of material fact." *Id.* at 908.

13

Plaintiff's declaration contains 44 paragraphs. [Doc. 63, Attachment 10; Doc. 66, Attachment 1]. Defendants point to paragraphs 3, 4 (footnote one), 5, 8, 11, 12, and 20 as being directly in conflict with plaintiff's deposition testimony. While paragraph 3 is said to be contradictory to plaintiff's deposition, plaintiff does not state that he never argued about the cell phone, only that he never argued about "taking the phone back." This statement does not directly contradict plaintiff's deposition testimony that he was arguing "back and forth about the matter of the phone" because an argument about "the matter of the phone" could encompass a number of subjects besides who retained or lost physical possession of the phone. Even if the argument were about "taking the phone back," that point is not relevant because this inquiry focuses on material facts, or facts "which might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). "[T]he substantive law will identify which facts are material," *id*., and this is not a fact which could affect the resolution of the claims of unreasonable force, of the denial of medical care, or of whether defendants are protected by certain forms of immunity.

Because only disputes about material facts matter, the inconsistencies between the footnote in paragraph 4 with plaintiff's deposition testimony as to the surname by which he knew Ashley, one of Ms. King's daughters, or whether Allie, another daughter, had a child, is inconsequential. Even so, plaintiff testified, in his deposition, that he "believe[d]" that Ashley's name is Wallace, whereas he states in the footnote that he has always known her as Ashley Spradling, and not Ashley Hamilton, as the City defendants refer to her in their brief. The statement in plaintiff's affidavit is not *directly* contrary to his deposition testimony

14

because he did not state unequivocally that her last name is "Wallace," but only that he believed "Wallace" was her name. Plaintiff's statement in the footnote of his declaration that Allie Hamilton did not have a child on September 4, 2007, is in harmony with his identification of Ashley as the mother of the child in his deposition testimony.

In paragraph 5 of his declaration, plaintiff avers that the officers allowed him to change clothes, whereas he answered, "No," in his deposition testimony when asked whether the officers let him get his clothes. This is flat out contradictory and the court will not consider it. But again, it is inconsequential to the issues of excessive force and medical care.

Defendants' challenge to paragraph 8 centers on an omission which they claim led to plaintiff's deposition statement which was only partially true—that he had purchased the phone and "did not have the phone or any part of it with me." The statement was only half-true, according to defendants, because plaintiff knew that the cell phone was in the yard where he had thrown it. The court disagrees. An individual who has discarded an item cannot, at the same time, carry the item on his person, so has to have it with him. A deponent is required to answer only those questions posed to him; he has no obligation to volunteer information which is not sought. *Aerel, S.R.L.*, 448 F.3d at 907.

Plaintiff's recovered memory as contained in Paragraph 11 is the basis for defendants' objection to paragraph 11 in his declaration. In his declaration, he identifies Tapp as the officer who jerked him out of the car, whereas, in his deposition, he testified that he could not identify that officer or describe what he looked like because "I see them all; they're just blue and stuff." While this is a direct contradiction of plaintiffs deposition testimony,

15

defendant Tapp testified in his deposition that it was he who pulled plaintiff from the car. This is a material fact involving the use of excessive force, but the information as to the identity of the officer, which is contained in plaintiff's declaration, was already disclosed in Tapp's deposition. Even though the court can ignore paragraph 11 in plaintiff's declaration, it makes no difference because it must consider the same exact information which was contained in Tapp's deposition.

Paragraph 12 in plaintiff's declaration is questioned by defendants because plaintiff states that he "had been sitting peacefully in the back of the police car," whereas he testified in his deposition that, at that point, he was "arguing back and forth over the phone . . .with Jeri" and that they were "yelling, but that [he] was talking to the cops." The court agrees that paragraph 12 directly contradicts plaintiff's sworn deposition testimony. One cannot be sitting peacefully in the back seat and, at the same time, arguing and yelling. The court will not consider it.

Lastly, defendants challenge paragraph 20 in plaintiff's declaration, which involves his request for medical treatment at the scene, as blatantly and completely contradictory to his deposition testimony. In his declaration, plaintiff states that, after landing on the ground, he told defendant Alcorn that Alcorn had broken his arm and that plaintiff "screamed and complained about [his] arm from then until [he] was taken to the Roane County Jail."

The court agrees that the second part of paragraph 20 is contradictory to plaintiff's deposition testimony. Plaintiff testified at his deposition that he told whoever was taking him to jail that his arm was killing him and that it was "just that one" and that "[i]t was the one

that told me to hold his arm."  As defendants point out, there is no dispute that the person who took plaintiff to jail and led him in to the jail is a County employee and not a Harriman police officer.  However, as to the first part of the paragraph 20, plaintiff testified that, while he did not know exactly what he said, he believed that when he hit the ground, he said,  "You broke my arm" or that he might have said something to that effect, but that he knew he "said something about his arm."  Therefore, the first part of paragraph 20 in the declaration does not contradict plaintiff's testimony at his deposition, but the last part concerning his screaming and complaining does so and the court will not consider it.

## IV.  **DISCUSSION**

In the first summary judgment motion, the City defendants contend that plaintiff's excessive force claims against Alcorn and Tapp lack merit; that his claims that these defendants denied him medical care are likewise baseless; that the individual officer defendants enjoy qualified immunity from damages in their individual capacities; that he has not established the elements of municipal liability so as to state a claim against defendant City of Harriman or its officers in their official capacity; and that for these reasons, all City defendants are entitled to summary judgment.  [Doc. 53, Supporting Memorandum].

In their motion, the County defendants assert the defense of qualified immunity as well.  Additionally, they maintain that plaintiff has not stated a medical claim against them, absent proof that a delay of medical care resulted in a detrimental effect, that he has not shown that which he must show to prevail on a claim against a municipality, such as the

17

County, or against its officers in their official capacity, and finally, that they too are entitled to summary judgment. [Doc. 56, Supporting Memorandum].

## A. City of Harriman, Tennessee, and Roane County, Tennessee

In order to state a claim under 42 U.S.C. § 1983, plaintiff must establish that he was deprived of a federal right by a person acting under color of state law. *Black v. Barberton Citizens Hospital*, 134 F.3d 1265, 1267 (6th Cir. 1998); *O'Brien v. City of Grand Rapids*, 23 F.3d 990, 995 (6th Cir. 1994); *Russo v. City of Cincinnati*, 953 F.2d 1036, 1042 (6th Cir. 1992). *See also Braley v. City of Pontiac*, 906 F.2d 220, 223 (6th Cir. 1990) ("Section 1983 does not itself create any constitutional rights; it creates a right of action for the vindication of constitutional guarantees found elsewhere.").

A municipality may be liable under 42 U.S.C. § 1983 for constitutional violations which result from acts representing official policy of the governmental entity. *Leach v. Shelby County Sheriff*, 891 F.2d 1241, 1244 (6th Cir. 1989). *See also Monell v. Dept. of Social Services of City of New York*, 436 U.S. 658, 694 (1978). Thus, "municipalities may be held liable under § 1983 only for acts for which the municipality itself is actually responsible, that is, acts which the municipality has officially sanctioned or ordered." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988) (internal quotation marks omitted).

> It is firmly established that a municipality, or as in this case a county, cannot be held liable under § 1983 for an injury inflicted solely by its employees or agents. For liability to attach, there must be execution of a government's policy or custom which results in a constitutional tort. Such a requirement ensures that a county is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the county. The "policy"

18

requirement is not meant to distinguish isolated incidents from general rules of conduct promulgated by city officials. Instead, the "policy" requirement is meant to distinguish those injuries for which county is responsible under § 1983, from those injuries for which the county should not be held accountable.

...

[A] plaintiff must demonstrate that "through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged. That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights."

*Gregory v. Shelby County, Tennessee*, 220 F.3d 433, 441-42 (6th Cir. 2000) (quoting *Board of County Comm'rs of Bryan County, Okl. v. Brown*, 520 U.S. 397, 404, 405 (1997)) (internal citations omitted).

"In analyzing the specific language in § 1983, the court in *Monell* concluded that the language plainly imposes liability on a governmental entity that, under the color of some official policy, 'causes' an employee to violate another's constitutional rights. Congress did not intend § 1983 liability to attach where causation is absent." *Deaton v. Montgomery County, Ohio*, 989 F.2d 885, 889 (6th Cir. 1993) (quoting *Monell*, 436 U.S. at 692).

In his amended complaint, plaintiff alleged that, pursuant to the pattern and practice of the City of Harriman, Tennessee, he was taken to the Roane County Jail instead of to a hospital despite his need for emergency medical treatment. [Doc. 2 at 7]. He apparently has abandoned that claim because, in his response to the motion for summary judgment, plaintiff instead alleges that the City of Harriman has an "informal policy" of "promoting an overly-

aggressive attitude amongst officers, allowing or encouraging the nonreporting of excessive force and other information, and otherwise allowing excessive force." [Doc. 63 at 15].

To illustrate that such a custom exists, plaintiff refers to the purported remark of the booking officer at the Roane County Jail that he was "tired of the Harriman Police beating up people and then dumping them at the jail for use to deal with." [*Id*. at 16]. Such a statement constitutes hearsay, however, which the court will not consider. Fed. R. Evid. 801(c). Plaintiff also refers to postings by Harriman police officers on the Internet or social networking sites which suggests that the City encourages the use of excessive force. These also constitute inadmissible hearsay. *See United States v. Jackson*, 208 F.3d 633, 637 (7th Cir. 2000) (web postings were properly excluded as hearsay).

To the contrary, the defendants have submitted the affidavit of Randy Heidel, Harriman's chief of police, who testifies that the City does not have a policy of condoning or encouraging the violation of anyone's constitutional rights; that it requires forty hours of annual training and P.O.S.T. certification of its police officers; that it performs extensive pre-employment screening of its prospective officers; and that defendants Alcorn and Tapp met those requirements. [Doc. 52, Attachment 2].

Plaintiff has failed to demonstrate that the City of Harriman, Tennessee, had a policy or custom of permitting or encouraging the use of excessive force by its police officers. Accordingly, the City is entitled to judgment as a matter of law and its motion for summary judgment will be granted.

With respect to Roane County, Tennessee, plaintiff in his amended complaint alleged generally a denial of medical treatment by the County defendants and that Roane County's policies and customs "were designed ineffectively to provide medical treatment." [Doc. 2 at 15]. In support of their motion for summary judgment, the County defendants have submitted a copy of Roane County Correction Facility Policy Number 11.2, which concerns the providing of medical care to jail inmates. [Doc. 55, Attachment 22]. The policy specifically states "It is the policy of Roane County Correctional Facility to provide each inmate with regular access to health care services from a qualified provider to screen, refer, and provide basic treatment for ongoing or emerging health care problems." [*Id*. at 1]. The policy sets out the manner in which inmates may seek treatment through sick call and how treatment is provided. [*Id*. at 1-2].

In his declaration in response to the motions for summary, plaintiff states that jail personnel ignored his requests for medical treatment "in violation of their own policies." [Doc. 66, Attachment 1, p. 7]. "[A] municipality is not liable under § 1983 for an injury inflicted solely by its employees or agents; the doctrine of respondeat superior is inapplicable." *Searcy v. City of Dayton*, 38 F.3d 282, 286 (6th Cir. 1994). Under the circumstances, plaintiff has failed to demonstrate that the Roane County, Tennessee, had a policy or custom which resulted in the denial of medical treatment to plaintiff. Accordingly, the County is entitled to judgment as a matter of law and its motion for summary judgment will be granted.

### B. Individual Defendants – Official Capacity

A suit against a municipal officer in his official capacity is in fact a suit against the municipality itself. *See Kentucky v. Graham*, 473 U.S. 159, 165 (1985); *Brandon v. Holt*, 469 U.S. 464, 471 (1985); *Monell*, 463 U.S. at 690 n.55. The court having found that the municipalities in this case are entitled to judgment as a matter of law, the individual defendants in their official capacity are likewise entitled to judgment as a matter of law and the motions for summary judgment filed by the defendants in their official capacity will be granted.

### C. City of Harriman, Tennessee, Defendants – Individual Capacity

Plaintiff alleges that the City police officers used excessive force during his arrest. "[A]ll claims that law enforcement officers have used excessive force -- deadly or not -- in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach." *Graham v. Connor*, 490 U.S. 386, 395 (1989). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id*. at 396.

> As in other Fourth Amendment contexts, however, the "reasonableness" inquiry in an excessive force case is an objective one: the question is whether the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation. An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional.

22

*Id*. at 397 (citations omitted).

Applying the "reasonableness" standard "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id*. at 396.

> With respect to a claim of excessive force, the same standard of reasonableness at the moment applies: "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers," violates the Fourth Amendment. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.

*Id*. at 396-97 (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2nd Cir. 1973)).

In his deposition, plaintiff admitted that at the time of his arrest he was drunk. [Doc. 52, Attachment 7, Excerpt from Deposition, pp. 14, 18-19]. While the officers were taking him outside house, he picked up the cell phone from the bedside table and then threw it outside in the yard because he knew it would upset Ms. King. [*Id*. at 20-21]. As plaintiff was being led to the police car, he continued to argue with Ms. King and her daughters about the cell phone with yelling back and forth between the ladies, the plaintiff, and the police officers. [*Id*. at 20-21, 24-25]. When the officers asked him for the cell phone, plaintiff denied having it. [*Id*. at 25]. At that point, plaintiff was jerked out of the police car and slammed against the back of the car, and then landed on the ground. [*Id*. at 27-28].

Defendant Tapp testified during his deposition that plaintiff gave him the cell phone after being placed in Tapp's police car, but that he had taken the battery out. [Doc. 52,

Attachment 8, Excerpt from Deposition, p. 7].  Tapp pulled plaintiff out of the car to search for the battery because plaintiff and Ms. King kept arguing about the cell phone, plaintiff "was cussing and ranting and raving and yelling back and forth at her," and the defendant wanted to calm her down.  [*Id*. at 7].  At that time plaintiff's hands were handcuffed in front of him and they were on top of the car.  [*Id*.].  When Tapp began searching plaintiff, plaintiff kept coming back off the car, despite repeated admonitions to keep his hands on top of the car.  [*Id*. at 8].  Plaintiff was "very angry, and he kept coming back off of the car jerking and cussing us."  [*Id*. at 9].  Finally, defendant Alcorn grabbed plaintiff's hands in order to cuff him in the back; he uncuffed one hand and plaintiff came toward Alcorn.  [*Id*. at 8].  Plaintiff and Alcorn got tangled up and went to the ground.  [*Id*.].

Defendant Alcorn testified in his deposition that when the officers arrived at Ms. King's residence, they were advised that she and plaintiff "had been fussing and fighting." [Doc. 52, Attachment 9, Excerpt from Deposition, p. 3].  When plaintiff saw the officers in his bedroom he was "a little agitated."  [*Id*.].  As they got to the police car with plaintiff, Ms. King was "running her mouth" and "she was really getting [plaintiff] fired up."  [*Id*. at 4]. According to Alcorn, when he uncuffed one of plaintiff's hands in order to handcuff him behind his back, plaintiff twisted and swung at him.  [*Id*. at 5].  Their legs got tangled, they started going to the ground, and Alcorn landed on top of plaintiff; Alcorn did not intend to take plaintiff to the ground but only to handcuff him behind his back.  [*Id*. at 5-6].

Based  upon the foregoing, and the entire record as a whole, the court finds that the defendants' use of force was not unreasonable in light of the escalating domestic situation

that they were faced with. To defuse the situation and calm down Ms. King, Tapp attempted to retrieve the cell phone battery. It was not unreasonable for the officers to attempt to restore the peace. Plaintiff became increasingly belligerent, Alcorn decided to cuff plaintiff's hands in the back instead of the front, they scuffled, and ended up on the ground.

The court cannot say that the defendants' conduct was objectively unreasonable under the circumstances. The defendants are thus entitled to judgment as a matter of law on plaintiff's claim of excessive force.

Plaintiff also alleges he told defendants Tapp and Alcorn that his shoulder was hurt and he should be taken to the hospital, but they instead took him to the Roane County Jail. In his deposition, however, plaintiff testified that he told the officer who took him to jail that his arm was killing him. [Doc. 52, Attachment 7, Excerpt from Deposition, pp. 32-33]. As noted previously, there is no dispute that it was a Roane County officer, and not a Harriman police officer, who transported plaintiff to jail. Accordingly, the defendants are entitled to judgment as a matter of law on plaintiff's claim that they denied him medical attention for his injured shoulder. The defendants' motion for summary judgment in their individual capacity will be granted.

As an alternative ground for their summary judgment motion, the defendants allege that they are entitled to qualified immunity to plaintiff's action for damages. The court having found that the defendants are entitled to judgment as a matter of law, it is not necessary to decide the question of qualified immunity. *See Seigert v. Gilley*, 500 U.S. 226

(1991) (only after concluding that plaintiff has introduced proof of a violation of his constitutional rights should the court address the issue of qualified immunity).

### D. Roane County, Tennessee, Defendants -- Individual Capacity

Plaintiff alleges that the County defendants failed to provide him with adequate medical treatment. The Eighth Amendment's ban against cruel and unusual punishment obliges prison authorities to provide medical care for prisoners' serious medical needs. In order to state a claim under § 1983 in the medical context, "a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). This protection extends to pre-trial detainees. *See Molton v. City of Cleveland*, 839 F.2d 240, 243 (6th Cir. 1988) ("A pretrial detainee's constitutional rights under the eighth and fourteenth amendments are denied by deliberate indifference to his serious medical needs just as such indifference denies the corresponding rights of a convicted prisoner.").

Under the *Estelle* standard, "[a] constitutional claim for denial of medical care has objective and subjective components." *Blackmore v. Kalamazoo County*, 390 F.3d 890, 895 (6th Cir. 2004). The objective component requires an inmate to establish that he is suffering from a sufficiently serious medical need, such that "'he is incarcerated under conditions posing a substantial risk of serious harm.'" *Brown v. Bargery*, 207 F.3d 863, 867 (6th Cir. 2000) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). The subjective component necessitates an inmate show that a prison official possessed a culpable state of mind. *Id.* "A defendant possess[es] a sufficiently culpable state of mind when he acts with deliberate

indifference." *Carter v. City of Detroit*, 408 F.3d 305, 312 (6th Cir. 2005) (citation omitted).

"Put simply, 'deliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding that risk.'" *Johnson v. Karnes*, 398 F.3d 868, 875 (6th Cir.2005) (quoting *Farmer v. Brennan*, 511 U.S. 825, 836 (1994)).

Upon being booked into the Roane County Jail on September 5, 2007, plaintiff indicated that he had a serious medical condition that might require attention. [Doc. 55, Attachment 3, Inmate Booking Screening Questions]. That same day, he filled out a medical request form in which he stated he thought his "collar bone might be broke." [*Id.*, Attachment 4, Medical Request Form dated September 5, 2007]. Defendant Mynatt testified during his deposition that he discussed plaintiff's shoulder injury with him that day. [*Id.*, Attachment 5, Excerpt from Deposition, p. 8]. Mynatt looked at plaintiff's shoulder and, because there appeared to be an abnormality, told the nurse to order an x-ray. [*Id.*]. Mynatt was unaware of the results of the x-ray nor did he follow-up with the nurse because medical issues were outside his area of expertise. [*Id.* at 9-10].

On September 5, 2007, Nurse Winsett filled out an request for an x-ray of plaintiff's right shoulder. [*Id.*, Attachment 8, X-Ray Order Request]. The x-ray was taken and Dr. Fred Shu examined the results and found no fracture or dislocation. [*Id.*, Attachment 9, Radiology Report]. Dr. Shu further noted "[t]he bony structures of the right shoulder appear intact without cortical or trabecular destruction." [*Id.*].

Subsequently, on September 20, 2007, plaintiff filled out a medical request form in which he complained of "2 sores" on his leg that were "red and oozing pus and blood." [*Id.*,

Attachment 10, Medical Request Form dated September 20, 2007]. Plaintiff was treated by the medical staff, who noted "NDA-ABT-BID B x 7 Days." [*Id*.]. He was released from the Roane County Jail four days later, on September 24, 2007. [*Id*., Attachment 11, Intake/Release Report].

Plaintiff testified at his deposition that during his incarceration in the Roane County Jail from September 5 until September 24, 2007, he only had contact with Mynatt the one time, on September 5, 2007. [*Id*., Attachment 6, Excerpt from Deposition, pp. 4-5]. On September 25, 2007, the day after his release, plaintiff sought medical treatment at the Methodist Medical Center's emergency room in Kingston, Tennessee. [*Id*. at 9].

The emergency room physician diagnosed an AC separation in the right shoulder. [*Id*., Attachment 12, Emergency Provider Record]. Plaintiff admitted that the emergency room physician advised plaintiff to follow up with an orthopedic doctor but plaintiff failed to do so. [*Id*., Attachment 6, Excerpt from Deposition, pp. 9, 12]. Plaintiff also admitted that the emergency room physician did not diagnose a staph infection nor otherwise treat him for the infection on his leg. [*Id*. at 10]. Plaintiff further admitted that since his release from the Roane County Jail the second time, he has not seen any doctor for treatment of his shoulder injury. [*Id*. at 11, 13].

Plaintiff returned to the Roane County Jail on October 1, 2007, upon his arrest for public intoxication and domestic assault, and was released on March 29, 2008. [*Id*., Attachment 13, Release Form]. Upon his being booked into the jail on that date, he indicated that he did not have a serious medical treatment that might require attention. [Doc. 55,

Attachment 14, Inmate Booking Screening Questions]. Nevertheless, he filled out an medical form on that date in which he stated he should be referred to a bone specialist [*Id.*, Attachment 15, Inmate Medical Form dated October 1, 2007]. Also on that date, he filled out a medical request form in which he stated "I need to have someone contact oak ridge hospital and find out when I'm supposed to see a bone specialist for my shoulder." [*Id.*, Attachment 16, Medical Request Form dated October 1, 2007]. Three days later plaintiff filled out another medical request form in which he stated "You was supposed to check with Oakridge hospital about me seing a bone specialist about my shoulder Im supposed to be wearing a sling for 6-8 weeks." [*Id.*, Attachment 17, Medical Request Form dated October 4, 2007]. In response, the jail medical staff noted that it would check with security about the sling and would check on the hospital appointment. [*Id.*].

On October 25, 2007, plaintiff filled out a grievance in which he complained that he had not yet seen the bone specialist like he was supposed to. [*Id.*, Attachment 18, Inmate Grievance Form dated October 25, 2007]. In an October 26 response to the grievance, defendant French stated that he would check with the nurse; nurse Winsett then responded in writing that no appointment had been made for plaintiff, that his condition was not life threatening, and that plaintiff could see a specialist of his choice upon his release from custody. [*Id.*].

Defendant French testified during his deposition that he recalled being told that plaintiff's shoulder had been x-rayed and there was nothing wrong with it. [*Id.*, Attachment 19, Excerpt from Deposition, p. 4]. With respect to the sling for plaintiff's arm, defendant

29

Mynatt testified during his deposition that a sling would not be allowed in the jail because it could be used as a weapon and thus is a security risk, and there would be no medical exception. [*Id.*, Attachment 5, Excerpt from Deposition, pp. 11-12].

In his declaration in response to the motion for summary judgment, plaintiff reiterates that he made numerous requests for medical treatment to no avail; that he was denied his prescribed medication; and that he was denied the use of the arm sling. [Doc. 66, Attachment 1, pp. 6-7].

Based upon the foregoing, and the record as a whole, it is clear that the decisions concerning plaintiff's medical treatment were made by the medical staff at the Roane County Jail. That being so, defendants Mynatt and French cannot be held liable for an alleged denial of medical care. *See, e.g., Graham v. County of Washtenaw*, 358 F.3d 377 (6th Cir. 2004). Municipal employees may "'rely on medical judgments made by medical professionals responsible for prisoner care.'" *Id.* at 384 (quoting *Ronayne v. Ficano*, No. 98-1135, 1998 WL 183479 at *3 (6th Cir. March 15, 1999) (unpublished opinion)); *see also Robbins v. Black*, 351 F. App'x 58, 63 (6th Cir. Nov. 3, 2009) ("Non-medical staff are entitled to assume that members of the medical staff are performing their duties properly unless they have reason to know otherwise.").

In addition, negligence, even gross negligence, will not support a § 1983 claim for denial of medical care. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *Gibson v. Foltz*, 963 F.2d 851, 853 (6th Cir. 1992). "Deliberate indifference to serious medical needs" is distinguishable from an inadvertent failure to provide adequate medical care.

30

> Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner.

*Estelle*, 429 U.S. at 106. *See also Gibson v. Matthews*, 926 F.2d 532, 536-37 (6th Cir. 1991) (negligence of medical personnel does not state a claim under § 1983 for deliberate indifference to medical needs); *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976) ("Where a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law.").

Moreover, to the extent plaintiff is alleging that he was harmed by a delay in receiving medical treatment, he has failed to prove that claim. *See Napier v. Madison County, Kentucky*, 238 F.3d 739 (6th Cir. 2001). "Specifically, we adopt the holding in *Hill* that '[a]n inmate who complains that delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment to succeed.'" *Id*. at 742 (quoting *Hill v. Dekalb Regional Youth Detention Center*, 40 F.3d 1176, 1188 (11th Cir. 1994)). *See also Rumsey v. Martin*, 28 F. App'x 500, 502 (6th Cir. 2002) (plaintiff inmate did not submit "medical evidence which clearly show[ed] that his condition deteriorated because of a delay in filling his prescriptions").

The defendants are entitled to judgment as a matter of law. For that reason, their motion for summary judgment in their individual capacity will be granted.

31

As an alternative ground for their summary judgment motion, the County defendants also allege that they are entitled to qualified immunity to plaintiff's action for damages. The court having found that the defendants are entitled to judgment as a matter of law, it is not be necessary to decide the question of qualified immunity.

**V.**    <u>**CONCLUSION**</u>

The motion for summary judgment filed by the City of Harriman, Tennessee, and Harriman police officers Steve Alcorn and Baron Tapp will be **GRANTED**; the motion for summary judgment filed by Roane County, Tennessee, Roane County jail supervisor Ken Mynatt, and jailer Alex French will be **GRANTED**; and this action will be **DISMISSED WITH PREJUDICE**. All other pending motions will be **DENIED** as **MOOT**.

**AN APPROPRIATE ORDER WILL ENTER.**

_____s/ Leon Jordan_____
United States District Judge
